**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MR. BIRD'S CAR WASH EQUIPMENT, LLC, | No. 4:19-CV-01752 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| VER-TECH LABS, | |
| Defendant. | |

**MEMORANDUM OPINION**

**MARCH 7, 2022**

The car wash supply distribution company Mr. Bird's Custom Car Wash Equipment, LLC filed suit against one of its suppliers, Ver-Tech Labs, for allegedly terminating the parties' contract without cause and then poaching its clients. Mr. Bird's pleads breach of contract and related equitable and tort claims. Ver-Tech now moves for summary judgment, raising valid questions about the contract and conduct at issue as well as the interplay between the contract and tort claims. Although certain claims cannot survive summary judgment, most counts may proceed—albeit in narrower form and on shaky legs. For the reasons provided below, Ver-Tech's motion for summary judgment is granted in part, denied in part.

## I.     BACKGROUND

### A.     The 2015 Oral Agreement

In 2015, Ver-Tech and Mr. Bird's "entered into an arrangement" under which "Ver-Tech agreed to provide car wash cleaning products to [Mr. Bird's] with the understanding that [Mr. Bird's] would sell the products to end users."[1] In exchange for the "dealer/distributorship relationship" and a discount on Ver-Tech products, Mr. Bird's promised to introduce Ver-Tech representatives to its customers.[2]

Because the parties reached this agreement orally and did not codify the terms in writing, certain provisions remain in dispute. According to Mr. Bird's, Ver-Tech promised "not to contact and/or sell directly to [Mr. Bird's] customers."[3] Ver-Tech does not explicitly affirm or deny that it made this commitment. It notes that "there was no written agreement preventing Ver-Tech from soliciting or doing business with any [Mr. Bird's] customers"[4] and later asserts (incorrectly) that

---

[1]   Doc. 46 ¶ 3; *see also* Doc. 50 at 3 (noting that the parties "operat[ed] under a verbal agreement from 2015 through 2017").

[2]   Doc. 1 ¶ 13; *see also* Doc. 50, Ex. J (Apr. 12, 2021 M. Early Dep.) 46:20–47:6 ("Q. Now, in Paragraph 13 you say, 'In 2015, Ver-Tech's representatives, Brian Chipman and Allen Luce, both acting on behalf of Ver-Tech, promised Mr. Bird's a dealer distribution relationship if Mr. Early would introduce the Ver-Teck representatives to Mr. Bird's customers. You say that, right? A. Yeah. Q. When in 2015 did that occur? A. I want to say that was late spring when we were working out our distributor oral agreement.").

[3]   Doc. 50 at 15; *see also* Doc. 50, Ex. J (Apr. 12, 2021 M. Early Dep.) 56:20–25 ("Q. Okay. So you had a verbal agreement [in 2015] with Ver-Tech that they would not sell to your customers forever? A. How about they communicated [to] me and made lots of promises that they would not sell to my customers.").

[4]   Doc. 46 ¶ 11.

Mr. Bird's CEO Mike Early repudiated the claim that Ver-Tech made this oral promise.[5] It does not, however, cite any testimony from its current or former employees rejecting or otherwise questioning the oral agreement. Additionally, Ver-Tech maintains that the parties did not agree to a set term or timeframe for the venture and similarly did not agree to any conditions that would determine the parties' right to terminate the arrangement.[6] Mr. Bird's asserts that the parties understood the agreement would remain in place for a "reasonable period of time."[7]

Despite this, the parties maintained their arrangement without issue from 2015 to 2017. Mr. Bird's sold Ver-Tech products to its customers, generating substantial revenues for both companies.[8] Additionally, Mr. Bird's introduced

---

[5]  Doc. 45 at 8 (citing Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 57:6–9, 63:18–65:6, 169:1–15).

[6]  Doc. 46 ¶¶ 5 ("Plaintiff does not contend that the purported 'verbal agreement' contained any sort of fixed term or duration"), 8 (asserting that the verbal agreement did not "specif[y] any conditions that would give rise to a limitation on either party's right to terminate the agreement").

[7]  Doc. 50 at 7.

[8]  Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 126:11–15 ("Q. Okay. Now, with respect to being lied to to get into the relationship, was the relationship profitable, or was it not profitable? A. It was very profitable for both of us."), 128:18–24 ("Q. But you—I'm asking you about your fraud claim. You said you were defrauded into this relationship. I'm asking you if that made you money or cost you money? You're saying it made you money, right? A. Until it was terminated."), 131:3–15 ("Q. Do you understand that by filing this complaint you've made an allegation that you were lied to and tricked into this relationship? A. It seems that way to me. Q. And the result of that trick was that you made profits for 2015, 2016, and 2017, correct? A. Yeah. Q. Have you offered to give those profits back to Ver-Teck? A. Why? Q. Have you? A. I haven't."), *accord* Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 28:20–29:3 ("Q. Okay. And would you say that Mr. Bird's—Early's business grew with the sale of Ver-Tech products from 2015 through the end of 2017? A. Mike's—say that again. Mike's what? Q. Would you say that Mr. Bird's sales of Ver-Tech products grew from 2015 through the end of 2017? A. I would say his sales grew.").

Ver-Tech representatives to its customers—specifically, New York-based Foam & Wash and Scrub-a-Dub[9]—and Ver-Tech provided Mr. Bird's exclusive distribution rights to this customer base.[10]

### B.    The 2017 Email Negotiations

In 2017, Mr. Bird's CEO Mike Early approached Ver-Tech Business Development Manager Allen Luce about entering a formal, written distributor agreement.[11] Asked during his deposition why, after operating under an oral agreement since 2015, he "all of a sudden want[ed] a written agreement," Early testified that he "needed to protect [his] investment and [his] relationships."[12] Early further explained that he believed "[i]n business you should always have an agreement" because "people don't always do the right thing."[13]

Between June and November 2017, Early and Ver-Tech representatives—namely, Luce and Ver-Tech CEO Tony Vertin—attempted to negotiate a written

---

[9]     *See* Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 27:23–28:6 ("Q. And did [Mike Early] introduce you—introduce you and Ver-Tech to Gary Baright's businesses? A. I already knew Gary Baright, but yes, Michael had a—had chemicals up at Gary Baright's, and I went up with him to set up Ver-Tech chemicals. Q. And did Mike Early or Mr. Bird's introduce you to the business account of Scrub-a-Dub? A. Yes.").

[10]    *See* Doc. 46 ¶ 3 ("In or around April 2015, [Ver-Tech] entered into an arrangement with [Mr. Bird's] where Ver-Tech agreed to provide car wash cleaning products to [Mr. Bird's] with the understanding that [Mr. Bird's] would sell the produce to end users."), *accord* Doc. 50 at 2 ("[Mr. Bird's] became a distributor of Ver-Tech produce for which he was exclusively responsible for distributing products to his customers in Pennsylvania and New York beginning in 2015.").

[11]    Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 61:25–62:23.

[12]    *Id*. at 63:18–22.

[13]    *Id*. at 64:22–65:12.

agreement with Early. Although certain conversations were in person,[14] the discussions relevant here occurred over email. They are as follows:

**June 8, 2017**:

Allen Luce emailed Mike Early a draft "Distribution Agreement" between "Ver-Tech Labs and Mister Birds Custom Car Wash Equipment." The agreement provides that "Ver-Tech labs will not sell to any customers of Mister Birds unless the following occur: Mister Birds chooses to no longer sell Ver-tech lab chemicals (VTL), [or] Mister Birds goes out of business." Further, the agreement notes that "[b]oth parties can cancel this agreement with a 30 day notice provided in writing and after both parties have worked to resolve any issues in the 30 days of cancellation notice."[15]

**October 11–12, 2017**:

Four months after sending the initial draft "Distribution Agreement," Luce followed up with Early: "Mike, I have not received the distributor agreement back from you that I started[.] [C]an you please send me that before you send to Tony [Vertin] as I would like to review it."[16] The next day, Early responded with an email attaching a new document titled "Vert-Tech And Mr Birds Distributor Rep Agreement." The undated document includes the following relevant provisions:

---

[14]   *See id.* at 62:8–12 ("[Q.] My question to you is what were your requests for a written distributor agreement? How were they made? A. They were conversation between me and Allen [Luce] face-to-face, oral.").

[15]   Doc. 1, Ex. A (June 8, 2017 A. Luce Email).

[16]   Doc. 1, Ex. B (Oct. 11–12, 2017 A. Luce & M. Early Emails).

- Non-solicitation: "[Ver-tech] acknowledges and agrees that it will not solicit sales from [Mr. Bird's] customers, nor sell [car wash products] directly to [Mr. Bird's] customers, during the terms of this Agreement and for a period of three (3) years immediately following the termination of this agreement."[17]

- Product Pricing: "For all [car wash] Products, [Ver-Tech] shall charge [Mr. Bird's] at least 40% off of the [Ver-Tech's] retail price for the Products. Notwithstanding the foregoing, the prices [Ver-Tech] charges [Mr. Bird's] for Products at any time during the term of this Agreement shall be no greater than the lowest prices [Ver-Tech] charges any of its other customers or representatives anywhere in the United States."[18]

**November 9, 2017**:

Tony Vertin emailed Early detailing "what we are prepared to offer you." Vertin noted that "[t]he Ver-tech Labs Distributor policy is the guideline for this agreement." Further, he outlined the following "[s]pecific terms" that Ver-Tech was "prepared to offer":

> 1. Mr. Birds receives a 45% discount on products with the exception of Drying Agents and Powders.
>
> 2. Mr. Birds pays freight for all drop shipments, plus a $50 fee. Freight allowance for shipment to Mr. Birds warehouse is per distributor policy.
>
> 3. Terms: 2% net 10, net 30. Quick pay discount is not allowed when paying by credit card.
>
> 4. In the event of termination of this agreement, Ver-tech labs will wait 45 days to pursue customers. Any customers given to Mr. Birds by Ver-tech Labs can be pursued immediately upon termination.[19]

---

[17]  *Id*. at 4 ¶ 3.
[18]  *Id*. at 4–5 ¶ 4(a).
[19]  Doc. 1, Ex. F (Nov. 9–10, 2017 T. Vertin & M. Early Emails).

Vertin concluded the email by writing, "I hope this email settles your concerns. I am unwilling to negotiate on this topic any further."[20]

**November 10, 2017**:

- 1:08 p.m.: Luce emailed Early that "[a]s of Monday Nov 13th your orders will be at 45% off list price and 40% off on drying agent and powders. Mr Birds will be responsible for freight and drop ship fee. All orders paid in 10 days [or] less will get a 2% discount. We would still like to see Mr Birds at 50% and being a stocking distributor." Luce concluded the email by noting that he "look[s] forward to working together and growing the business."[21] These terms generally accord with those outlined by Vertin the day prior; however, there is no mention of (a) the discount carveout for "Drying Agents and Powders," (b) the discount available for order payments "net 30," or (c) the 45-day non-competition period following termination of the agreement. Additionally, Luce's November 10 email preceded any response from Mr. Bird's accepting Vertin's November 9 offer.

- 2:10 p.m.: Early responded to Vertin's November 9 email, writing: "Got it, [i]t's just what we spoke about. I will forward over to our council [sic]. Do you have clarification on how this agreement will terminate?"[22] Early makes no mention of Luce's email sent an hour prior.

- 2:43 p.m.: In response to Early's question about "how this agreement will terminate," Vertin wrote, "First of all, I would prefer that you direct these questions to Allen or Brian. I have empowered them to deal with this situation. I will say that I am somewhat mystified about the sudden urgency for a distributor contract. . . . I am not sure I understand the question about termination. I am going to sound like a smart ass, but it seems to me the only way the proposed contract would terminate is if you drop VTL. I do not have any contracts with any distributor currently, nor do I want any. How does any agreement terminate? Typically, agreements are for set terms and have conditions that would cause a breach in the contract. I am not sure we have agreed to any of those conditions. If I am going [through] the expense to have a contact written more than our general agreement previously presented[,] [h]ere are

---

[20]  *Id.*

[21]  Doc. 1, Ex. E (Nov. 10, 2017 A. Luce Email).

[22]  Doc. 1, Ex. F (Nov. 9–10, 2017 T. Vertin & M. Early Emails).

several breach conditions that I would insist upon: 1. If Mr. Birds or any entity associated with Mr. Birds sells or uses any chemical products other than from Ver-tech Labs, the whole agreement is in breach[;] 2. Non-payment[;] 3. If Mr. Birds fails to grow business[;] 4. If Mr. Birds fails to make a good faith effort to sell VTL products. I am sure there are other conditions, but these come to mind."[23]

**November 13, 2017**:

Early responded to Luce's email from November 10 writing, "Sorry, I did not notice Friday's Nov 10th Email changed shipping deal to end on 10th of October instead of Nov 13th."[24] Early then detailed his understanding of the parties' relationship moving forward:

> I would appreciate Ver-Tech Labs, contacting me directly [with] regards [to] any of Mr Bird's Customers. Moving forward Mr. Bird will be doing [m]onthly servicing and paying freight cost to all of Mr. Birds [c]ustomers. Including Scrub A Dub, Foam & Wash and EZ Wash as agreed.

> Ver-Tech Labs [h]as [p]icked up shipping cost for a few years. Mr. Birds will now take its turn picking up shipping costs. When order is placed from Mr Bird's customers, I will text order to you.

> Two weeks is not enough time to fix our shipping issues.

> By First Quarter of next year, Mr Bird's will contract a freight company to deliver product to Williamsport. Mr Bird's will set up staff to do fulfillment out of our Williamsport warehouse.

---

[23]   Doc. 1, Ex. G (Nov. 10, 2017 T. Vertin Email).
[24]   Doc. 1, Ex. H (Nov. 10, 2017 M. Early Email).

> Today, I just finished meeting with R&L Rep. Still must
> meet with FedEX Rep."[25]

## C.   Termination of the Business Relationship

On December 15, 2017, Ver-Tech terminated its relationship with Mr. Bird's

and informed Mr. Bird's that it would no longer be able to distribute Ver-Tech

products.[26] According to Early, Ver-Tech did not provide any reason or

explanation for why it ended this arrangement.[27]

Shortly after, Mr. Bird's learned that prior to terminating their agreement,

Ver-Tech had been in contact with certain Mr. Bird's customers about selling its

products to them directly—that is, without going through Mr. Bird's.[28] Indeed, on

November 30, 2017, Luce and Vertin traveled to New York to meet with

representatives from Foam & Wash and Scrub-a-Dub—both Mr. Bird's customers

at that time—about establishing a direct distribution relationship.[29] According to

---

[25]  *Id.*

[26]  Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep. Tr.) 106:13–107:13.

[27]  Doc. 50, Ex. J (Apr. 12, 2021 M. Early Dep. Tr.) 164:5–12 ("Q. Did they tell you whenever they spoke to you when they terminated your agreement in December of 2017 that they were terminating your agreement for cause? A. No. Q. Did they give you any reason whatsoever? A. No.").

[28]  Doc. 1 ¶ 37.

[29]  Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 113:6–18 ("Q. November 30th, 2017, there were flight arrangements made on behalf of you and Tony Vertin to go to New York. It says, looks like me might be dropping Mr. Bird's. Tony and Allen are going to see if they can get some accounts direct. What accounts did you and Tony go to in New York on or about November 30th, 2017, to get accounts direct? A. The only accounts that were being done [sic] business up there we discussed. Q. Which ones? A. I would say we probably saw Foam & Wash and Scrub-a-Dub."), 115:14–21 ("Q. Well, the intention of Ver-Tech before this meeting, Allen, is clearly stated in Exhibit 26. A. Mm-hmm. Q. We'll be dropping Mr. Bird's, and we're going to New York to get customers direct? A. Looks like we might be dropping Mr. Bird's, might be dropping Mr. Bird's.").

Luce, during their meeting, a Scrub-a-Dub representative stated that "they don't really need Mike Early. They don't need to pay through a middleman. They buy everything else direct, and, you know, they didn't see the value in Mike Early."[30]

These meetings proved fruitful for Ver-Tech. After ending its relationship with Mr. Bird's, Ver-Tech started providing its products directly to Foam & Wash and Scrub-a-Dub, who promptly stopped doing business with Mr. Bird's.[31] Ver-Tech maintains that these customers stopped purchasing car wash supplies from Mr. Bird's because of its "non-performance and charging them freight."[32] According to Early, he spoke to representatives from Foam & Wash and Scrub-a-Dub, and they both told him that "[t]hey got a better deal" from Ver-Tech: by bypassing Mr. Bird's and purchasing the supplies directly from Ver-Tech, they were able to get a "better discount."[33] Mr. Bird's denies ever charging these customers freight.[34]

### D.   Procedural Posture

On October 7, 2019, Mr. Bird's filed suit against Ver-Tech based on Ver-Tech's termination of the parties' relationship and successful efforts to

---

[30]  *Id*. at 113:25–114:11.
[31]  Doc. 50 at 10; *see also* Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep. Tr.) 104:5–106:6.
[32]  Doc. 46 ¶ 22.
[33]  Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep. Tr.) 105:1–106:1.
[34]  *Id*. at 104:19–25 ("Q. Did [Scrub-a-Dub] tell you that they had to get rid of you because you were charging them freight? A. I never charged them freight. Q. Same question with Foam & Wash, have you had any discussion with them as to— A. I never charged them freight.").

establish direct distribution arrangements with Mr. Bird's customers.[35] The

Complaint consists of six claims: (1) Count I – Breach of Contract; (2) Count II –

Tortious Interference with Contractual Relations; (3) Count III – Fraud in the

Inducement; (4) Count IV – Unjust Enrichment; (5) Count V – Promissory

Estoppel; and (6) Count VI – Violation of the Pennsylvania Unfair Trade Practices

and Consumer Protection Law.[36]

    After discovery, Ver-Tech moved for partial summary judgment on

Count VI.[37] On May 20, 2021, the Court granted Ver-Tech's motion and dismissed

that count.[38]

    On June 11, 2021, Ver-Tech moved for summary judgment on the remaining

five counts.[39] That motion has been fully briefed and is now ripe for disposition.[40]

## II.   LAW

    Under Federal Rule of Civil Procedure 56, summary judgment is appropriate

where "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[41] Material facts are

those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if

evidence exists from which a rational person could conclude that the position of

---

[35]  Doc. 1.
[36]  *Id.*
[37]  Doc. 27.
[38]  Doc. 41; Doc. 42.
[39]  Doc. 44.
[40]  Doc. 45; Doc. 50; Doc. 52.
[41]  Fed. R. Civ. P. 56(a).

the person with the burden of proof on the disputed issue is correct."[42] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[43] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[44]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[45] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[46] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[47] Instead, it must "identify those facts of record which would contradict the facts identified by the movant.'"[48]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[49] the Court "must view the

---

[42] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[43] *Clark*, 9 F.3d at 326.

[44] *Id.*

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[46] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[47] *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[48] *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002).

[49] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

facts and evidence presented on the motion in the light most favorable to the nonmoving party."[50] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[51] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[52]

## III.   ANALYSIS

### A.   Breach of Contract (Count I)

Ver-Tech first moves for summary judgment on Count I (breach of contract). To maintain a breach of contract claim, a plaintiff must establish three things: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages."[53] Additionally, the Supreme Court of Pennsylvania has held that "it is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties."[54]

Here, the issue of which alleged contract governs the dispute and therefore what conduct purportedly constituted breach remains, to put it mildly, muddled. In presenting its breach of contract claim, Mr. Bird's discusses two separate contracts:

---

[50]   *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[51]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[52]   Fed. R. Civ. P. 56(c)(3).

[53]   *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

[54]   *Id.*

(1) a 2015 oral agreement; and (2) an alleged 2017 agreement negotiated via email between June and November of that year.[55] At the onset of this litigation, Mr. Bird's presented the former as the only contract at issue; however, in its most recent filings, Mr. Bird's discusses a separate, "newly negotiated" contract from 2017.[56]

To this Court, that seems an odd (and rather misguided) strategic choice. For the reasons provided below, there is a genuine dispute over whether Ver-Tech breached the 2015 oral agreement. But the alleged 2017 agreement simply never existed.

### 1.    The 2015 Oral Agreement

Although Mr. Bird's has shifted its focus to the alleged 2017 agreement in its opposition to Ver-Tech's summary judgment motion, the Court must nevertheless address whether the facts adduced in discovery establish a genuine dispute about Ver-Tech's purported breach of the 2015 oral agreement. They do— though not for the precise reasons Mr. Bird's articulates.

### a.    The Contract

The parties agree that in 2015, they "entered into an arrangement" under which "Ver-Tech agreed to provide car wash cleaning products to [Mr. Bird's]

---

[55] The parties also reference Ver-Tech's National Distributor Policy, *see*, *e.g.*, Doc 45 at 4, but Mr. Bird's does not claim that this policy governed the parties' arrangement and accordingly does not premise its breach of contract claim on this policy. *See* Doc. 50 at 2–9.

[56] *Compare* Doc. 1 ¶¶ 39–49, *with* Doc. 50 at 3–5.

with the understanding that [Mr. Bird's] would sell the products to end users."[57] Although the parties dispute certain material terms—namely, the duration of the contract[58] and the alleged non-solicitation provision[59]—as well as whether Mr. Bird's "ever truly became a 'distributor' as defined by Ver-Tech,"[60] these disagreements do not negate or call into doubt the existence of the contract.

### b.    The Breach

In its Complaint, Mr. Bird's identified two ways in which Ver-Tech allegedly breached the 2015 agreement: (1) "by terminating the contract without cause and or no reason on or about December 15, 2017"; and (2) "by immediately contacting Mr. Bird's customers for the purpose of selling directly to Mr. Bird's customers to the immediate harm and detriment of Mr. Bird's."[61] Although the first argument fails as a matter of law, the second raises a genuine dispute.

Under Pennsylvania law, distribution agreements are governed by the Pennsylvania Uniform Commercial Code (the "Code").[62] Section 2–309(b) of the

---

[57] Doc. 46 ¶ 3; *see also* Doc. 50 at 3 (noting that the parties "operat[ed] under a verbal agreement from 2015 through 2017").

[58] *Compare* Doc. 46 ¶ 5 ("[Mr. Bird's] does not contend that the purported 'verbal agreement' contained any sort of fixed term or duration."), *with* Doc. 51 ¶ 5 (admitting that "the initial agreement entered into by and between the parties in April 2015 was a verbal agreement," but denying that "the references to Mr. Early's deposition stand for the propositions stated in this [p]aragraph" of Doc. 46).

[59] *Compare* Doc. 45 at 8 ("[S]worn testimony in this case established that it is undisputed that no such agreement (verbal or written) actually existed."), *with* Doc. 50 at 8 ("Mr. Early testified that Ver-Tech verbally agreed to not sell to his customers.").

[60] Doc. 46 ¶ 9; *see also* Doc. 50 at 3 (arguing that Ver-Tech "cannot, in good conscience, deny that [Mr. Bird's] was a distributor of Ver-Tech products").

[61] Doc. 1 ¶¶ 46, 47.

[62] *D & M Sales, Inc. v. Lorillard Tobacco Co.*, 2010 WL 786550, at *3 (E.D. Pa. Mar. 8, 2010); *see also Weilersbacher v. Pittsburgh Brewing Co.*, 218 A.2d 806, 807–08 (Pa. 1966).

Code states that "[w]here the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."[63] This provision tracks with Pennsylvania courts' longstanding disfavor of contracts of perpetual duration.[64]

Still, Pennsylvania courts recognize that in rare instances, contracts silent on duration may nevertheless be "construed as providing for a reasonable time or some particular period."[65] But this determination is permissible only when the court—by looking at "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement"—can confidently "infer [that] the parties intended the agreement to last for a particular period."[66] Absent any "unusual circumstances manifesting an intention that [a contact] would continue for any particular period of time," courts view the contract as "at will, terminable by either party."[67]

---

[63]  13 Pa. C.S.A. § 2309(b).

[64]  *See, e.g., Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 n.5 (Pa. 1986) (recognizing the following "well-settled rule[] of construction": "a lease will not be construed to create a perpetual term unless the intention is express in clear and unequivocal terms"); *Slonaker v. P.G. Publishing Co.*, 13 A.2d 48, 50 (Pa. 1940) ("The general rule is that when a contract provides that one party shall render service to another, or shall act as his agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will.").

[65]  *Slonaker*, 13 A.2d at 51; *see also Weilersbacher*, 218 A.2d at 807 (noting that "[i]n some few instances, [the Pennsylvania Supreme] Court permitted an exception to the general rule" that contracts that "did not specify a definite term or prescribe conditions which would determine the duration thereof, . . . could be terminated at will by either party").

[66]  *Roberts Technology Group, Inc. v. Curwood, Inc.*, 2015 WL 5584498, at *4 (E.D. Pa. Sept. 23, 2015) (citing *Slonaker*, 12 A.2d at 50–51).

[67]  *Weilersbacher*, 218 A.2d at 808.

Here, Ver-Tech argues that Mr. Bird's "does not contend that the purported 'verbal agreement' contained any sort of fixed term or duration," or specify "any conditions that would give rise to a limitation on either party's right to terminate the agreement."[68] Although understandably reluctant to do so, Mr. Bird's effectively admits as much.[69] More importantly, there is no evidence contradicting Ver-Tech's representation that the 2015 oral agreement was silent on the agreement's duration or term. Because the 2015 oral agreement was indefinite, this Court must presume that it is "at will, terminable by either party."[70]

Mr. Bird's asserts that this presumption is "overcome" by the circumstances surrounding the parties' performance under the contract.[71] Specifically, Mr. Bird's notes the following:

- The "sales [for Mr. Bird's] grew materially from 2015 through 2017";

- Mr. Bird's was "part of [Ver-Tech's] business development plan for the year 2018";

- Ver-Tech intended to "help [Mr. Bird's] find and train a sales representative and continue to grow the business";

- Mr. Bird's CEO Mike Early "told [Ver-Tech CEO Tony Vertin] that [Mr. Bird's] was close to hiring a sales representative to handle the market in Pittsburgh, Pennsylvania"; and

---

[68]   Doc. 46 ¶¶ 5, 8.

[69]   Doc. 51 ¶ 8 ("It is admitted that neither the referenced paragraphs in the complaint, nor the National Distributor Policy make reference to any conditions that would determine the parties [*sic*] rights to terminate the initial agreement the parties entered into in April 2015.").

[70]   *Weilersbacher*, 218 A.2d at 808.

[71]   Doc. 50 at 6–7.

- The Mr. Bird's "warehouses were, at all times, stocked with Ver-Tech products."[72]

According to Mr. Bird's, "[i]t is axiomatic that [it] would not have invested in any of these things, but for the expectation that the agreement with Ver-Tech would remain in place for a reasonable period of time."[73]

Be that as it may, none of these facts—assessed individually or collectively—qualify as the type of "unusual circumstances" evidencing both parties intended the agreement to last for a particular period.[74] At most, these facts show that the parties had maintained their manufacturer-distributor relationship and were prepared to sustain it moving forward. Both contractually and practically, the parties "were bound to nothing."[75] As such, the 2015 verbal agreement was "at will, terminable by either party."[76] The Court therefore agrees with Ver-Tech that its "termination of the relationship or contract for any reason or no reason at all was permitted and was, as a matter of law, not a breach."[77]

However, Ver-Tech representatives contacting Mr. Bird's customers is an entirely different matter. In its Complaint, Mr. Bird's alleges that as part of the 2015 verbal agreement, Ver-Tech "promised it would not interfere with Mr. Bird's customers by selling directly to or directly pursuing Mr. Bird's customers or

---

[72] *Id.* at 6.
[73] *Id.* at 7.
[74] *Weilersbacher*, 218 A.2d at 808.
[75] *Id.*
[76] *Id.*
[77] Doc. 45 at 3.

otherwise interfering with Mr. Bird's customer relationships"; however, "[i]mmediately following termination of the distributor agreement, Mr. Bird's became aware that, beginning in late November to early December, Ver-Tech had already been directly contacting Mr. Bird's customers and had already started selling its products directly to Mr. Bird's customers."[78] In discovery, Mr. Bird's produced or obtained evidence that arguably supports both allegations. Specifically, Mike Early testified that Ver-Tech orally agreed it would not sell to Mr. Bird's customers.[79] And then Ver-Tech Business Development Manager Allen Luce gave deposition testimony acknowledging that he and Tony Vertin made a trip to New York on November 30, 2017—sixteen days *before* Ver-Tech terminated its relationship with Mr. Bird's—to meet with two Mr. Bird's customers about removing the "middleman" (i.e., Mr. Bird's) and establishing direct account relationships.[80]

---

[78]  Doc. 1 ¶¶ 37, 44.

[79]  Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep. Tr.) 56:20–25 ("Q. Okay. So you had a verbal agreement [in 2015] with Ver-Tech that they would not sell to your customers forever? A. How about they communicated [to] me and made lots of promises that they would not sell to my customers.").

[80]  Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 113:6–114:23 ("Q. November 30th, 2017, there were flight arrangements made on behalf of you and Tony Vertin to go to New York. It says, looks like me might be dropping Mr. Bird's. Tony and Allen are going to see if they can get some accounts direct. What accounts did you and Tony go to in New York on or about November 30th, 2017, to get accounts direct? A. The only accounts that were being done [sic] business up there we discussed. Q. Which ones? A. I would say we probably saw Foam & Wash and Scrub-a-Dub. Q. And what was the purpose of this trip? A. To discuss business with those accounts, chemicals and where they stood. Q. Did you offer direct shipment and a deal or discounts directly with these accounts? A. Did I personally? . . . Q. I'm asking you, you were part of those meetings, and what was said with regards to dealing directly with these accounts on behalf of— A. It was said by—it was said by Scrub-a-Dub that they don't really need Mike Early. They don't need to pay through a middleman. They buy everything else

Ver-Tech disputes the enforceability of this alleged oral non-solicitation provision. Specifically, Ver-Tech asserts that because "there are no contemporaneous writings evidencing this purported 'non-solicitation' term," it is unenforceable under Pennsylvania's statute of frauds.[81] But an agreement may escape the statue of frauds' purview if "there is evidence to establish that the agreement was made."[82] Evidence demonstrating that an agreement was made must be clear and competent, and "it may be proven by the acts and declarations of the parties, either together or separately."[83]

Although far from overwhelming, that evidence exists here. Not only did Early testify that Ver-Tech made this commitment in 2015, but when he approached Luce in June 2017 about codifying this commitment in writing, Luce responded with a draft proposal that included multiple provisions restricting Ver-Tech from "selling chemicals direct to Mister Birds customers."[84] If Luce or Ver-Tech had concerns with this request or considered it unrelated to the 2015 verbal agreement, there is no indication of that in the June 2017 email.[85] Indeed, when

---

[81] direct, and, you know, they didn't see the value in Mike Early, and that they would have no problem—they would like to buy direct to begin with, that they didn't feel they needed them, and I was servicing them.").

[81] Doc. 45 at 8–9 (citing 13 Pa. S.C.A. § 2201).

[82] *Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1276 (3d Cir. 1995).

[83] *Kurland v. Stolker*, 533 A.2d 1370, 1373 (Pa. 1987).

[84] Doc. 1, Ex. A (June 8, 2017 A. Luce Email) (attached "Distributor Agreement" provides that "Ver-Tech labs will not sell to any customers of Mister Birds unless the following occur: Mister Birds chooses to no longer sell Ver-tech lab chemicals (VTL), [or] Mister Birds goes out of business").

[85] *Id.*

asked about it at his deposition, Luce stated only that he "didn't understand why [Early] was worried about [Ver-Tech selling directly to his customers] because he had no reason to be at the time."[86]

Moreover, Ver-Tech's representatives have had multiple opportunities to explicitly deny the existence of this oral commitment, but to the Court's knowledge, they never have. In its Statement of Material Facts, Ver-Tech asserts only that "there was no *written* agreement preventing Ver-Tech from soliciting or doing business with any [Mr. Bird's] customers."[87] Ver-Tech does not cite any testimony from its current or former employees rejecting or otherwise calling into question the *oral* agreement. Indeed, Ver-Tech's Statement of Material Facts makes no mention of the alleged oral agreement whatsoever.[88]

In its moving brief, Ver-Tech claims that "sworn testimony in this case established that it is undisputed that no such agreement (verbal or written) actually existed," asserting that "Mike Early testified to this at his deposition both on cross-examination and on his counsel's rehabilitation."[89] But the deposition testimony it cites does not support this claim. Early testified that it "would be [Ver-Tech's] choice" to "immediately sell" to Mr. Bird's customers "*after they terminated*" the

---

[86]   Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 51:2–19.
[87]   Doc. 46 ¶ 11 (emphasis added).
[88]   *See id.*
[89]   Doc. 45 at 8 (citing Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 57:6–9, 63:18–65:6, 169:1–15).

parties' agreement.[90] But that's not the issue here. The issue is whether Ver-Tech orally promised "not [to] directly pursue Mr. Bird's customers" while engaging Mr. Bird's as a distributor. When asked about that, Early testified that Ver-Tech representatives "communicated [to] me and made lots of promises that they would not sell to my customers."[91] Although Early later testified that he wanted this commitment codified in writing,[92] he never repudiated his central claim that Ver-Tech orally promised not to pursue Mr. Bird's customers.

Given the existence and likely enforceability of the oral non-solicitation provision and the evidence that Ver-Tech representatives met with Mr. Bird's customers prior to terminating the contract to discuss possible direct distribution arrangements, there is, at the very least, a genuine dispute about whether Ver-Tech breached the 2015 verbal agreement.

### c.   The Damages

Finally, Mr. Bird's argues that it "suffered damages as a result of [Ver-Tech's] interference, as Mr. Bird's no longer had a relationship with either Foam & Wash or Scrub-a-Dub"—the two New York-based Mr. Bird's customers that Ver-Tech representatives met with prior to terminating its agreement with Mr. Bird's.[93] Ver-Tech does not dispute this.[94]

---

[90]   Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 57:6–9 (emphasis added).
[91]   *Id*. at 56:20–25.
[92]   *See id*. at 169:1–15.
[93]   Doc. 50 at 10.
[94]   *See* Doc. 45 at 2–9; Doc. 52 at 3–13.

Instead, Ver-Tech asserts that it is entitled to judgment as a matter of law because Mr. Bird's "has presented no evidence to establish legally-recoverable damages."[95] Ver-Tech challenges the expert report Mr. Bird's submitted, arguing that the proffered expert relied on "an improper method of calculating damages"— that is, "lost gross profits."[96] Ver-Tech cites the United States Court of Appeals for the Third Circuit's 1973 opinion in *Deaktor v. Fox Grocery Co.* for the proposition that "[t]he proper measure of damages under Pennsylvania law is net profits, not gross profits."[97]

In a relatively recent decision in *Roberts Technology Group, Inc. v. Curwood, Inc.*, the Third Circuit analyzed *Deaktor* and declined to adopt the categorical rule that Ver-Tech proposes here.[98] In *Roberts Technology*, the Third Circuit held that although the plaintiff's damages expert "focused on gross lost profits, rather than net lost profits," the trial record "contain[ed] sufficient evidence upon which a jury could rely to conclude that [the plaintiff] would not have incurred any additional substantial expenses in the absence of a breach."[99] Importantly, the Third Circuit emphasized that its denial of the defendant's motion for judgment as a matter of law on damages "does not amount to an endorsement

---

[95]   Doc. 45 at 18.

[96]   *Id*. at 17–18.

[97]   *Id*. at 18 (citing *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir. 1973)).

[98]   695 F. App'x. 48, 51, 54 (3d Cir. 2017).

[99]   *Id*. at 51–52, 54.

of [the plaintiff's damages expert's] analytical approach."[100] Rather, the Third

Circuit explained the limitations associated with the procedural mechanism the

defendant employed:

> [T]he proper way to challenge improper expert testimony
> is through a *Daubert* motion filed before trial, or, if
> testimony extends beyond the scope of an expert report,
> through an objection made at the time the improper
> testimony is elicited. A motion for a judgment as a matter
> of law is not an adequate substitute for those well-
> established mechanisms. At this point, we are reviewing
> the jury's verdict and must affirm if any reasonable jury
> could have reached the verdict in light of the evidence
> presented at trial.[101]

Here, Ver-Tech requests judgment as a matter of law, but neither Ver-Tech

nor Mr. Bird's analyzes the expert report in any detail. Importantly, neither party

assesses whether the expert report—or the summary judgment record—"contain[s]

sufficient evidence" about whether Mr. Bird's "would not have incurred any

additional substantial expenses in the absence of a breach."[102] Indeed, the scant

briefing on this subject underscores the Third Circuit's admonition that "[a] motion

for judgment as a matter of law is not an adequate substitute" for a *Daubert*

motion.[103]

At this juncture, the Court declines to grant Ver-Tech summary judgment

based on the adequacy of the damages calculation presented by Mr. Bird's. To the

---

[100] *Id*. at 54.

[101] *Id*.

[102] *Roberts Technology*, 695 F. App'x. at 54.

[103] *Id*.

extent Ver-Tech wishes to challenge the legal applicability of the damages report

Mr. Bird's relies on, there are other, more appropriate avenues for doing so.

### 2.   The 2017 Agreement

Separately, Mr. Bird's asserts that documentary evidence of email

communications between Mike Early (on behalf of Mr. Bird's) and Allen Luce and

Tony Vertin (on behalf of Ver-Tech) "demonstrate[] that the parties had reached a

new agreement [in November 2017] relative to the distributorship between

[Mr. Bird's] and [Ver-Tech]."[104] Ver-Tech disagrees, arguing that this "secondary

breach of contract claim fails because no actual agreement ever came to fruition

and no such offer was ever accepted."[105] On this, the Court agrees with Ver-Tech.

Under Pennsylvania law, "a contract is created where there is mutual assent

to the terms of a contract by the parties with the capacity to contract."[106] To

establish mutual assent to the contractual terms, a party seeking to an enforce the

alleged contract must first show "that an offer has been made."[107] This offer "must

be intentional, definite, in its terms, and communicated; otherwise, no meeting of

the minds can occur."[108] As such, "it is well established that evidence of

preliminary negotiations or a general agreement to enter a binding contract in the

---

[104]  Doc. 50 at 5.

[105]  Doc. 52 at 12.

[106]  *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Board*, 739 A.2d 133, 136 (Pa. 1999).

[107]  *Stumpp v. Stroudsburg Municipal Authority*, 658 A.2d 333, 335 (Pa. 1995).

[108]  *Id.*

future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce."[109]

The Supreme Court of Pennsylvania has held that "the question of whether an undisputed set of facts establishes a contract is a matter of law."[110] Accordingly, when a plaintiff argues on summary judgment that letters or emails "create an enforceable contract between [the parties]" and the documents "are not susceptible to more than one reasonable interpretation or construction," the existence of a contract is a question of law properly adjudged by the Court.[111]

Here, the email communications between Mr. Bird's and Ver-Tech from June to November 2017 constitute only preliminary negotiations, and therefore did not create a binding contract. On November 9, 2017, Tony Vertin emailed Mike Early "[s]pecific terms" that Ver-Tech was "prepared to offer."[112] The following day—before Early responded to Vertin—Ver-Tech Business Development Manager Allen Luce sent Early an email detailing contractual terms that would govern the parties' relationship moving forward.[113] Although Luce generally

---

[109] *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998) (citing *Goldman v. McShain*, 247 A.2d 455, 468 (Pa. 1968)).

[110] *Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc.*, 671 A.2d 1140, 1146 (Pa. 1996); *see also* 17 Am.Jur.2d, Contracts § 18 ("While the existence of a contract is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court.").

[111] *EBC, Inc. v. Clark Building Systems*, 2007 WL 4563518, at *4 (W.D. Pa. Dec. 21, 2007).

[112] Doc. 1, Ex. F (Nov. 9–10, 2017 T. Vertin & M. Early Emails).

[113] Doc. 1, Ex. E (Nov. 10, 2017 A. Luce Email).

reiterated the terms Vertin outlined, he omitted certain material provisions—critically, the proposed 45-day non-competition period.[114]

Early ignored Luce's email and instead responded to Vertin, stating that he would send the proposed terms to his attorney and asking for clarification on "how this agreement will terminate."[115] Vertin replied shortly thereafter, stating that "[t]ypically, agreements are for set terms and have conditions that would cause a breach in the contract," but noting, "I am not sure we have agreed to any of those conditions."[116]

That's where the negotiations ended. Based on the documents presented, it appears Early never responded to Vertin. Instead, Early replied to Luce's November 10 email, addressing only the limited set of terms Luce discussed. Mr. Bird's never accepted the proposed 45-day non-competition period or any "breach conditions"—indeed, Mr. Bird's made no mention of these proposed terms.

Mr. Bird's cannot now enforce proposed contractual provisions it nether accepted nor even acknowledged. Because the undisputed statement of facts does not establish a "meeting of the minds," the Court finds that the alleged 2017 agreement is not an enforceable contract.

---

[114]  *Id.*
[115]  Doc. 1, Ex. F (Nov. 9–10, 2017 T. Vertin & M. Early Emails).
[116]  Doc. 1, Ex. G (Nov. 10, 2017 T. Vertin Email).

### B.      Tortious Interference with Contractual Relations (Count II)

Ver-Tech next argues that Count II (tortious interference) is barred by the gist of the action doctrine because the alleged interference—specifically, Ver-Tech's direct contacts with Mr. Bird's customers—relates only to a purported contractual obligation: "there exists no implied social policy against ordinary and standard industry competition."[117] Mr. Bird's responds that it pleads tortious interference "as an alternative to the breach of contract claim," and as such, it "may proceed unless, and until, a decision is determined as to the contractual obligations of [Ver-Tech] as it relates to [Mr. Bird's] customers."[118] Mr. Bird's is mistaken.

Under Pennsylvania law, "the 'gist of the action' doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract."[119] To determine whether a claim sounds in contract or tort, Pennsylvania courts consider "the *nature* of the duty breached."[120] If the duty breached "is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract."[121] Conversely, if the claim "involves the defendant's

---

[117]  Doc. 45 at 9.
[118]  Doc. 50 at 9–10.
[119]  *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 n.8 (3d Cir. 2002) (citing *Phico Insurance Co. v. Presbyterian Medical Services Corp.*, 663 A.2d 753, 757 (Pa. Super. 1995)).
[120]  *Bruno v. Erie Insurance Co.*, 106 A.3d 48, 63 (Pa. 2014).
[121]  *Id*. at 68.

violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort."[122]

As a general matter, "courts agree that dismissals under the gist of the action doctrine should take care not to preclude a party's right to plead claims in the alternative."[123] However, when the alleged tortious conduct implicates a duty whose source "could only be contractual," such as "a duty not to compete," a plaintiff cannot elide the gist of the action doctrine simply by asserting it pleads the tort claim in the alternative.[124]

Here, Mr. Bird's predicates its tortious interference claim on Ver-Tech's efforts to compete with Mr. Bird's over its established customers: "[Ver-Tech] took intentional and purposeful action to contact [Mr. Bird's] customers, without [Mr. Bird's] knowledge, in an effort to obtain their direct business."[125] But Mr. Bird's "does not have a right to be free from competition and [Ver-Tech] has no duty 'imposed by law as a matter of social policy' not to compete with

---

[122] *Id.*

[123] *DePuy Synthes Sales, Inc. v. Globus Medical, Inc.*, 259 F. Supp. 3d 225, 235 (E.D. Pa. 2017); *see also USG Insurance Services, Inc. v. Bacon*, 2016 WL 6901332, at *7 (W.D. Pa. Nov. 22, 2016) ("[C]ourts should be cautious when considering whether to dismiss a claim under the gist of the action doctrine because the Federal Rules of Civil Procedure allow parties to plead multiple claims as alternative theories of liability.").

[124] *Chemtech International, Inc. v. Chemical Injection Technologies, Inc.*, 170 F. App'x 805, 806 (3d Cir. 2006).

[125] Doc. 50 at 10.

[Mr. Bird's]."[126] It is well established that "[o]nly a contract can confer such a right and impose such a duty."[127]

Properly understood, the tortious interference claim sounds in contract, not tort. This ruling is in no way contingent on "the contractual obligations of [Ver-Tech] as it relates to [Mr. Bird's] customers";[128] rather, it is dictated by "the *nature* of the duty" Ver-Tech allegedly breached.[129] Accordingly, Ver-Tech's motion for summary judgment as to Count II is granted.

## C.   Fraud in the Inducement (Count III)

Ver-Tech argues that summary judgment as to Count III (fraud in the inducement) is proper for three reasons: (1) the claim is barred by the gist of the action doctrine; (2) the claim is barred by the economic loss doctrine; and (3) Mr. Bird's failed to establish the essential elements of the claim.[130] The Court disagrees. The first two points fail as a matter of law. For the third, although the evidence is far from overwhelming, there is enough to establish a genuine factual dispute on the contested elements of the claim.

---

[126] *Chemtech*, 180 F. App'x at 809.

[127] *Id*.

[128] Doc. 50 at 10. *See Chemtech*, 170 F. App'x at 809 ("[A] failure to state a claim for breach of contract does not mean that a tort claim based on the same conduct cannot be barred by the 'gist of the action' doctrine.").

[129] *Bruno*, 106 A.3d at 63.

[130] Doc. 45 at 11–13.

### 1.    Gist of the Action

Ver-Tech contends that as with the tortious interference claim, the fraud in the inducement claim is barred by the gist of the action doctrine. Specifically, Ver-Tech notes that "the alleged representation (Ver-Tech will not contact [Mr. Bird's] customers for the purpose of selling to them directly) . . . was incorporated into the parties' alleged 'contract,'" and, as such, "[i]f any action can be maintained, it is then only an action in contract."[131] Again, Mr. Bird's responds that it "pled fraud in the inducement as an alternative to the breach of contract claim," and, as such, "should it ultimately be determined that [Ver-Tech] did not owe to [Mr. Bird's] a contractual duty not to contact [its] customers directly, then . . . [Ver-Tech] has, instead, fraudulent[ly] induced [Mr. Bird's] into engaging in business with [Ver-Tech]."[132] Although the arguments here mirror those for the tortious interference claim, the law dictates a different outcome.

As discussed, the parameters of the gist of the action doctrine are well established;[133] however, the question of "whether (and when) the . . . doctrine applies to bar fraudulent inducement claims" remains unresolved.[134] Because the Pennsylvania Supreme Court has not settled this issue, Pennsylvania's intermediate

---

[131] *Id*. at 12.
[132] Doc. 50 at 11–12.
[133] *See Bruno*, 106 A.3d at 63.
[134] *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 517 (E.D. Pa. 2012).

courts and courts of this Circuit have endeavored to predict how it would likely rule. The results vary.

Pennsylvania appellate courts have adopted a categorical approach, holding that where a party's "tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist of the action doctrine."[135] Conversely, following Judge Stewart R. Dalzell's cogent and persuasive opinion in *Vives v. Rodriduez*,[136] district courts in this Circuit generally employ a fact-specific analysis to determine whether the tort and contract claims are "interwoven," thus precluding the tort claim, or whether the fraud claim is "collateral" to the contract.[137] Courts consider claims "interwoven" where the alleged misrepresentations that induced the plaintiff to enter the contract were "later incorporated" into the agreement.[138] Put differently, courts of this

---

[135] *Sullivan v. Chartwell Investment Partners, LP*, 873 A.2d 710, 719 (Pa. Super. 2005); *see also Mirizio v. Joseph*, 4 A.3d 1073, 1085 (Pa. Super. 2010) (holding that the defendant's "actions constituted fraud in the inducement, and therefore, the claim for fraud and misrepresentation was not barred by the gist of the action doctrine").

[136] 849 F. Supp. 2d at 516–22.

[137] *Diodato v. Wells Fargo Insurance Services, USA, Inc.*, 44 F. Supp. 3d 541, 554–55 (M.D. Pa. 2014) (Connor, J.); *see also Wen v. Willis*, 117 F. Supp. 3d 673, 681–83 (E.D. Pa. 2015) (finding that Judge Dalzell's decision in *Vives* "is the most instructive and, ultimately, persuasive on [the] issue" of "whether (and when) the gist of the action doctrine applies to bar fraudulent inducement claims"); *Irish Isle Provision Co., Inc. v. Polar Leasing Co., Inc.*, 2013 WL 6077362, at *5 (M.D. Pa. Nov. 19, 2013) (adopting Judge Dalzell's analysis in *Vives*).

[138] *Wen*, 117 F. Supp. 3d at 682–83; *see also Niiaryee v. Davison Design & Development, Inc.*, 2018 WL 1072439, at *6 (W.D. Pa. Feb. 27, 2018) ("[T]he 'gist of the action' doctrine bars fraudulent inducement claims where the false representation concerned duties later enshrined in the contract."); *cf. Morrison v. AccuWeather, Inc.*, 2015 WL 4357346, at *6 (M.D. Pa. July 14, 2015) (holding that "the gist of the action doctrine does not act to bar Plaintiff's fraudulent misrepresentation claim on" the alleged misrepresentations *not* included the contract).

Circuit have consistently held that "the gist of the action bars tort claims concerning the promisor's intent to perform under the contract."[139]

Consistent with the courts of this Circuit, this Court declines to adopt the categorical approach propounded by the Pennsylvania Superior Court in *Sullivan*,[140] and instead endorses the fact-specific analysis offered by Judge Dalzell in *Vives*.[141] Accordingly, the Court must analyze the alleged misrepresentation that Mr. Bird's argues induced it to enter the 2015 oral agreement with Ver-Tech and determine whether it is interwoven with, or collateral to, the agreement underlying the breach of contract claim.

For this, Mr. Bird's pleading in the alternative becomes dispositive. As discussed, Mr. Bird's predicates its breach of contract claim, in part, on Ver-Tech's verbal commitment to refrain from soliciting direct relationships with Mr. Bird's customers—the same alleged misrepresentation underlying its fraudulent inducement claim.[142] If, as Mr. Bird's contends, this commitment became a part of the 2015 verbal agreement, then the fraudulent inducement claim concerns only Ver-Tech's intention to follow through on its alleged contractual obligations. Such

---

[139] *North American Communications, Inc. v. Herman*, 2018 WL 2186422, at *4 (W.D. Pa. May 11, 2018); *see also Malone v. Weiss*, 2018 WL 827433, at *5 (E.D. Pa. Feb. 12, 2018) ("Permitting a fraudulent inducement claim [based on the allegation that the defendant never intended to honor the contract] would essentially negate the entire . . . gist of the action doctrine because a Plaintiff would have only to allege that Defendants never intended to abide by a provision in their contract in order to escape dismissal.").

[140] 873 A.2d at 719.

[141] 849 F. Supp. 2d at 516–22.

[142] Doc. 1 ¶¶ 37, 44.

tort claims are barred by the gist of the action doctrine.[143] However, if it is ultimately determined that the non-solicitation provision did not become an enforceable part of the parties' agreement, the fraudulent inducement claim would not be impermissibly "interwoven" with the breach of contract claim.[144]

Here, Ver-Tech argues that the non-solicitation provision is unenforceable under the statute of frauds.[145] Although the Court considers the evidence, as presented, sufficient to take this provision outside the purview of the statue of frauds, that determination remains subject to the facts of the case. This uncertainty renders Ver-Tech's request for dismissal based on the gist of the action doctrine premature.

### 2.   Economic Loss Doctrine

Separately, Ver-Tech argues that the fraudulent inducement claim should be dismissed under the economic loss doctrine.[146] According to Ver-Tech, "fraud claims can survive the economic loss doctrine only if they are not related to the terms of the alleged contract."[147] But Ver-Tech dedicates only a sentence of its moving brief to this argument. That's for a good reason. In *Werwinski v. Ford Motor Co.*—the sole case Ver-Tech cites—the Third Circuit predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to claims of

---

[143]   *See*, *e.g.*, *North American Communications*, 2018 WL 2186422, at *4.
[144]   *Wen*, 117 F. Supp. 3d at 682–83.
[145]   Doc. 45 at 8–9.
[146]   Doc. 45 at 13 (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002)).
[147]   *Id.*

intentional fraud,[148] but it carved out a "limited exception to the economic loss doctrine for fraud-in-the-inducement claims if the fraud is extraneous to the contract and not interwoven with the breach of contract."[149] As addressed in the previous sub-section, if the non-solicitation term is ultimately deemed unenforceable, the fraudulent inducement claim would be distinct from, rather than interwoven with, the breach of contract claim. The Court therefore declines to grant Ver-Tech's motion for summary judgment as to Count III on this basis.

### 3.    Elements of the Claim

Finally, Ver-Tech asserts that based on the undisputed facts, Mr. Bird's failed to establish certain elements required to maintain a claim for fraud in the inducement—namely, intent to defraud and justifiable reliance.[150] Mr. Bird's disagrees, arguing that "there remain substantial disputes regarding issues of material facts in this case."[151] Although it is a close call, the Court agrees with Mr. Bird's.

Under Pennsylvania law, to maintain a claim for fraud in the inducement, a plaintiff must show the following: "(1) a representation; (2) which is material to

---

[148]  286 F.3d at 681.

[149]  *Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 256 F. Supp. 2d 329, 337 (E.D. Pa. 2003); *see also Morrison v. AccuWeather, Inc.*, 2015 WL 4357346, at *7 (M.D. Pa. July 14, 2015) (holding that "the economic loss doctrine will not bar Plaintiff's claims for fraudulent misrepresentation" because "Plaintiff alleges fraud in the inducement and the allegations that he relays are undoubtedly distinct from, rather than interwoven with, his breach of contract claim").

[150]  Doc. 45 at 12–13; Doc. 52 at 15.

[151]  Doc. 50 at 12.

the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."[152] The plaintiff must prove each element "by clear and convincing evidence."[153]

Here, Mr. Bird's asserts that "while the parties were negotiating an oral contract" regarding the distribution of Ver-Tech's products, Ver-Tech "promised not to sell to [Mr. Bird's] customers."[154] According to Mr. Bird's, "but for [Ver-Tech's] promises not to interfere with and contact [Mr. Bird's] customers, [Mr. Bird's] would not have agreed to enter into any contractual arrangement with [Ver-Tech]."[155] Further, Mr. Bird's argues that "as a result of these fraudulent misrepresentations [it] has lost customers, namely Foam & Wash and Scrub-a-Dub, thus resulting in lost profits for the company."[156]

Ver-Tech considers the summary judgment record insufficient to establish that it acted with the requisite intent or that Mr. Bird's justifiably relied on the representation at issue. For the intent prong, Ver-Tech contends that the only evidence of its purported intent to defraud Mr. Bird's comes from Mike Early's deposition testimony, in which he stated that Ver-Tech orchestrated a "secret plot"

---

[152] *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 256–57 (3d Cir. 2013).
[153] *Id*. at 257.
[154] Doc. 50 at 11 (citing Doc. 50, Ex. J (Apr. 12, 2021 M. Early Dep.) 56:20–25).
[155] *Id*.
[156] *Id*.

to steal Mr. Bird's customers.[157] When asked whether this "plot" began at the onset of the parties' relationship (i.e., 2014–2015), Early responded that "it seemed like that's what's happening towards the end of the relationship" (i.e., 2017).[158] Ver-Tech asserts that "[i]f the 'secret plot' occurred in late 2017, Ver-Tech could not have induced [Mr. Bird's] to enter into the parties relationship in 2015, and Ver-Tech could not have induced [Mr. Bird's] to introduce Ver-Tech to customers in 2017 that [Mr. Bird's] had already introduced to Ver-Tech in 2015."[159]

But Ver-Tech ignores a critical fact: in direct contravention of the alleged non-solicitation commitment, Ver-Tech representatives met with certain Mr. Bird's customers in November 2017 to discuss removing the "middleman" (i.e., Mr. Bird's) and establishing direct account relationships.[160] It's not simply that Early *believed* there was a plot to steal Mr. Bird's customers; Ver-Tech tried to poach the customers while its exclusive distribution agreement with Mr. Bird's remained in effect. Additionally, when asked whether he understood Early's concern that Ver-Tech may sell directly to Mr. Bird's customers, Allen Luce testified that he "didn't understand why [Early] was worried about it because he had no reason to be *at the time*."[161] Given Ver-Tech's efforts to solicit business from Mr. Bird's customers and the temporal limitation Luce placed on Ver-Tech's

---

[157] Doc. 52 at 15 (citing Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 124:10–15).
[158] *Id.*
[159] *Id.*
[160] Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 113:6–114:23.
[161] *Id.* at 51:16–19 (emphasis added).

alleged non-solicitation commitment, there is a genuine dispute as to whether Ver-Tech's oral commitment not to sell to Mr. Bird's customers was "made falsely."[162]

For the reliance prong, Ver-Tech asserts that the fraud in the inducement claim is barred because any reliance on the alleged representation "is unjustifiable and unreasonable as a matter of law."[163] Ver-Tech points to Early's deposition testimony—specifically, Early's statements that he "had concerns that [his] customers would be taken" and that "in business, you should have a written agreement"—as evidence that any reliance was unreasonable.[164] According to Ver-Tech, Early knew he could not "rely on [Ver-Tech's] 'verbal' representation."[165]

The Court finds this argument wholly unpersuasive. Under Ver-Tech's formulation, no individual or business could ever justifiably rely on oral representations made by a contracting counterparty. If the Court were to adopt this standard, it would arguably render unenforceable all oral contracts—a counterparty could simply assert that the plaintiff should have known its oral representations

---

[162] *Freeman*, 709 F.3d at 257.
[163] Doc. 45 at 12.
[164] *Id*. (citing Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep.) 61:25–62:25, 169:1–15).
[165] *Id*. at 13.

were not reliable. That position cannot be reconciled with existing contract law in Pennsylvania and throughout the United States.[166]

Analyzing the summary judgment record in the light most favorable to Mr. Bird's, the Court concludes that a reasonable jury could find that Ver-Tech's oral commitment not to sell to or interfere with Mr. Bird's customers was false and that Mr. Bird's reliance on this commitment was justifiable. Accordingly, the Court denies Ver-Tech's motion for summary judgment as to Count III.

### D.    Unjust Enrichment (Count IV)

Ver-Tech next moves for summary judgment as to Count IV (unjust enrichment), arguing that Mr. Bird's cannot maintain this claim because it "benefitted from the parties' relationship and benefitted from all purported agreements between the parties."[167] Mr. Bird's disputes Ver-Tech's characterization of the facts, asserting that it "conferred a benefit upon [Ver-Tech] when [it] introduced its customers to [Ver-Tech], and [Ver-Tech] proceed[ed] to directly contact these customers in order to sell to them directly, cutting [Mr. Bird's] out of the transaction entirely."[168] Mr. Bird's contends that as a result, the benefit conferred "lies solely with [Ver-Tech] and, in fact, to the detriment of

---

[166] *See Meyer, Darragh*, 137 A.3d at 1258 ("[I]t is axiomatic that a contract may be manifest orally, in writing, or as an inference from the acts and conduct of the parties.").
[167] Doc. 45 at 14.
[168] Doc. 50 at 13.

[Mr. Bird's] who lost those customers as a result of [Ver-Tech's] actions."[169] Here, the Court agrees with Ver-Tech.

Pennsylvania courts recognize that "[u]njust enrichment is essentially an equitable doctrine."[170] To maintain a claim for unjust enrichment, a plaintiff must prove the following: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[171] For the third prong, it is well established that "the mere fact that one party benefits from the act of another is not itself sufficient to justify restitution."[172] Indeed, "[c]ourts will not find unjust enrichment where [a] plaintiff has rendered services to advance [its] own interest."[173]

Mr. Bird's argues that "[i]n 2015, Ver-Tech's representatives . . . promised Mr. Bird's a dealer/distributorship relationship if [Mr. Bird's CEO Mike Early] would introduce the Ver-Tech representatives to Mr. Bird's customers."[174] Both

---

[169]  *Id.*

[170]  *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999) (internal quotation marks and citation omitted).

[171]  *Id.*

[172]  *Norris Sales Company, Inc. v. Target Division of Diamant Boart, Inc.*, 2002 WL 31771169, at *4 (E.D. Pa. Dec. 11, 2002) (citing *Meehan v. Cheltenham Township*, 189 A.2d 593, 595 (Pa. 1963)).

[173]  *Id.*; *see also King of Prussia Equipment Corp. v. Power Curbers, Inc.*, 117 F. App'x. 173, 176 (3d Cir. 2004) (affirming that "unjust enrichment will not be found where Plaintiff rendered services to advance its own interests").

[174]  Doc. 1 ¶ 13; *see also* Doc. 50, Ex. J (Apr. 12, 2021 M. Early Dep.) 46:20–47:6 ("Q. Now, in Paragraph 13 you say, 'In 2015, Ver-Tech's representatives, Brian Chipman and Allen Luce,

parties adhered to these commitments—Mr. Bird's introduced Ver-Tech to its customers,[175] and Ver-Tech provided Mr. Bird's exclusive distribution rights to this customer base.[176] The parties further agree that this arrangement proved "very profitable for both."[177]

Because Mr. Bird's profited from this venture, it cannot credibly dispute that it "rendered services to advance [its] own interest."[178] Therefore, Mr. Bird's cannot recover damages for unjust enrichment.[179] If Ver-Tech improperly poached

---

both acting on behalf of Ver-Tech, promised Mr. Bird's a dealer distribution relationship if Mr. Early would introduce the Ver-Teck representatives to Mr. Bird's customers. You say that, right? A. Yeah. Q. When in 2015 did that occur? A. I want to say that was late spring when we were working out our distributor oral agreement.").

[175] *See* Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 27:23–28:6 ("Q. And did [Mike Early] introduce you—introduce you and Ver-Tech to Gary Baright's businesses? A. I already knew Gary Baright, but yes, Michael had a—had chemicals up at Gary Baright's, and I went up with him to set up Ver-Tech chemicals. Q. And did Mike Early or Mr. Bird's introduce you to the business account of Scrub-a-Dub? A. Yes.").

[176] *See* Doc. 46 ¶ 3 ("In or around April 2015, [Ver-Tech] entered into an arrangement with [Mr. Bird's] where Ver-Tech agreed to provide car wash cleaning products to [Mr. Bird's] with the understanding that [Mr. Bird's] would sell the produce to end users."), *accord* Doc. 50 at 2 ("[Mr. Bird's] became a distributor of Ver-Tech produce for which he was exclusively responsible for distributing products to his customers in Pennsylvania and New York beginning in 2015.").

[177] Doc. 46, Ex. 2 (Apr. 12, 2021 M. Early Dep. Tr.) 126:11–15 ("Q. Okay. Now, with respect to being lied to to get into the relationship, was the relationship profitable, or was it not profitable? A. It was very profitable for both of us."), 128:18–24 ("Q. But you—I'm asking you about your fraud claim. You said you were defrauded into this relationship. I'm asking you if that made you money or cost you money? You're saying it made you money, right? A. Until it was terminated."), 131:3–15 ("Q. Do you understand that by filing this complaint you've made an allegation that you were lied to and tricked into this relationship? A. It seems that way to me. Q. And the result of that trick was that you made profits for 2015, 2016, and 2017, correct? A. Yeah. Q. Have you offered to give those profits back to Ver-Teck? A. Why? Q. Have you? A. I haven't."), *accord* Doc. 50, Ex. B (Mar. 29, 2021 A. Luce Dep.) 28:20–29:3 ("Q. Okay. And would you say that Mr. Bird's—Early's business grew with the sale of Ver-Tech products from 2015 through the end of 2017? A. Mike's—say that again. Mike's what? Q. Would you say that Mr. Bird's sales of Ver-Tech products grew from 2015 through the end of 2017? A. I would say his sales grew.").

[178] *Norris Sales*, 2002 WL 31771169 at *4.

[179] *Id.*

Mr. Bird's customers at the end of the relationship, the remedies available to Mr.

Bird's lie in contract and tort—not equity. Ver-Tech's motion for summary

judgement as to Count IV is granted.

### E.    Promissory Estoppel / Detrimental Reliance (Count V)

Lastly, Ver-Tech argues that the Court should grant summary judgment as to

Count V (promissory estoppel), arguing that "where a party claims there is an

enforceable contract, it cannot make a successful promissory estoppel claim."[180]

But that's not quite right.[181]

Under Pennsylvania law, "[a] cause of action for promissory estoppel arises

when a party relies to his detriment on the representations of another party."[182] The

Third Circuit explains that "[i]t operates to protect a promisee whose reliance

cannot be secured by contract because the promise on which he relied was

unsupported by consideration."[183] Because "promissory estoppel has no application

when parties have entered into an enforceable agreement, . . . the finding of an

enforceable contract defeats the validity of promissory estoppel" claims.[184]

---

[180]  Doc. 45 at 15 (citing *W. Chester University Foundation v. MetLife Insurance Co. of Connecticut*, 259 F. Supp. 3d 211 (E.D. Pa. 2017)).

[181]  Separately, Ver-Tech claims that Mr. Bird's failed to establish that he justifiably or reasonably relied on the alleged verbal representation that Ver-Tech would not contact its customers. *Id.* at 16. The Court considered, and rejected, this argument when addressing Ver-Tech's motion for summary judgment as to Count III. *See supra* Section III.C.3.

[182]  *Synesiou v. DesignToMarket, Inc.*, 2002 WL 501494, *4 (E.D. Pa. Apr. 3, 2002) (citing *Carlson v. Arnot-Ogden Memorial Hospital*, 918 F.2d 411, 416 (3d Cir. 1990); *Thomas v. E.B. Jermyn Lodge No. 2*, 693 A.2d 974, 977 (Pa. Super. 1997)).

[183]  *Messaro Ltd. Partnership (Park West Two) v. Baker v. Taylor Inc.*, 161 F. App'x 185, 188 (3d Cir. 2005); *see also Fried v. Fisher*, 196 A. 39, 41 (Pa. 1938).

[184]  *Synesiou*, 2002 WL 501494, at *4 (citing *Carlson*, 918 F.2d at 416.

That said, Federal Rule of Civil Procedure 8(a) permits plaintiffs to seek "relief in the alternative."[185] Courts therefore consider it "proper for [plaintiffs] to plead claim[s] for promissory estoppel as an alternative to [their] breach of contract claims," particularly when "the validity and terms of the contract[s] have not been determined."[186]

Here, the terms of the 2015 oral agreement remain in dispute. As discussed, Ver-Tech argues that even if it orally agreed to refrain from pursuing direct contractual ties with Mr. Bird's customers, this provision is unenforceable under the statute of frauds.[187] Because the enforceability of this provision is fact-dependent and therefore potentially subject to change based on the evidence presented at trial, dismissal of the promissory estoppel claim would be premature.[188] Ver-Tech's motion for summary judgment as to Count V is denied.

## IV.   CONCLUSION

Mr. Bird's made an unwise business decision: it agreed to supply Ver-Tech products to its customers in exchange for Ver-Tech's broad, unqualified commitment not to seek direct distribution agreements with these customers. The agreement's undefined duration and lack of breach terms meant that either party could terminate it at any time, for any reason. That said, as a matter of law, the

---

[185]  Fed. R. Civ. P. 8(a)(3).

[186]  *TAKTL, LLC v. IWR, North America, LLC*, 2020 WL 5802994, at *3 (W.D. Pa. Aug. 20, 2020).

[187]  Doc. 45 at 8–9.

[188]  *See TAKTL*, 2020 WL 5802994, at *3 n.1 ("Of course, if it is found that a valid contract exists, [the] claim for promissory estoppel would be foreclosed.").

potential enforceability of the non-solicitation provision keeps alive the breach of contract and certain related tort claims. Practically speaking, it's unclear the extent of damages Mr. Bird's can reasonably claim based on the more narrowly construed contract and terms, but that's an issue for another day. Here, the Court grants Ver-Tech's motion for summary judgment as to Counts II (tortious interference) and IV (unjust enrichment). However, the motion for summary judgment as to Counts I (breach of contract), III (fraudulent inducement), and V (promissory estoppel) is denied.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge